IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

LITO FLORALDE ADAMS,

       Plaintiff,

v.                                   Case No.: 3:13-cv-04896

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

       Defendant.

PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-motions for summary judgment and judgment on the pleadings, respectively. (ECF Nos. 11, 14).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned RECOMMENDS that Plaintiff's motion for

1

judgment on the pleadings be **GRANTED**, that the Commissioner's motion for judgment on the pleadings be **DENIED**, that the decision of the Commissioner be **REVERSED,** and that this case be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   <u>Procedural History</u>

Plaintiff, Lito Floralde Adams ("Claimant"), filed the instant SSI and DIB applications on August 9, 2008, alleging a disability onset date of December 30, 2006. (Tr. at 140, 143). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 49, 53, 60, 63). Claimant filed a request for an administrative hearing, (Tr. at 66), which was held on February 15, 2011 before the Honorable Jimmy N. Coffman, Administrative Law Judge ("ALJ"). (Tr. at 18-32). By written decision dated April 26, 2011, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 10-17). Claimant filed a request for review by the Appeals Council and submitted new evidence in support of his claim, which was incorporated into the administrative record. (Tr. at 328-29). The ALJ's decision became the final decision of the Commissioner on January 7, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 325-27).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 7, 8, 9), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 11, 14). Consequently, the matter is fully briefed and ready for resolution.

II.    **Claimant's Background**

Claimant was 45 years old at the time of his alleged onset of disability, and 49 years old at the time of the ALJ's decision. (Tr. at 17, 140). He completed high school and communicates in English. (Tr. at 18-32, 182). His prior employment history includes working as a laborer in a navy exchange and warehouse, a packer in a food plant/warehouse, and a produce worker in a grocery store. (Tr. at 179).

III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2011. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 30, 2006, the alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant's epilepsy constituted a severe impairment. (*Id.*, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or

combination of impairments that meets or medically equals any of the listed impairments. (*Id.*, Finding No. 4). The ALJ then determined that Claimant had:

> [T]he residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c) and 416.967(c). The claimant can occasionally lift and carry fifty pounds and frequently lift and carry twenty-five pounds out of an eight-hour workday. The claimant can stand and walk six hours out of an eight-hour workday and sit six hours out of an eight-hour workday.

(Tr. at 12-15, Finding No. 5). Despite his RFC determination, the ALJ found that Claimant was unable to perform past relevant work as a laborer, produce worker, or packer, all of which were classified as medium exertional level. (Tr. at 15-16, Finding No. 6). The ALJ then reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 16, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1961, and was defined as a younger individual; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because applying the Medical-Vocational Rules directly supports a finding of "not disabled" regardless of transferable skills. (*Id.*, Finding Nos. 7-9). Given these factors and Claimant's RFC, the ALJ relied upon Medical-Vocational Rule 203.29, which directs a finding of "not disabled" for younger individuals with a high school education who communicate in English, and can perform the full range of medium work. (*Id.*, Finding No. 10). Accordingly, the ALJ concluded that Claimant was not entitled to benefits because he had not been under a disability, as defined in the Social Security Act from December 30, 2006 through the date of the decision. (*Id.*, Finding No. 11).

## IV.  **Plaintiff's Arguments**

Plaintiff argues that the Commissioner's decision is not supported by substantial

evidence because the ALJ failed to include nonexertional limitations in his RFC assessment, in contravention of the relevant Social Security Rulings and Regulations. (ECF No. 11 at 5-8).

## V.    Relevant Medical History

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Medical Records

On April 20, 2005, Claimant attended an annual check-up appointment with Dennis D. Dewey, M.D. of Jacksonville Neurological Clinic. (Tr. at 243). Claimant had not had a seizure in over two years, and reported that he continued with his medication, and denied any side effects. (Tr. at 243). Claimant's physical examination was essentially normal. (*Id.*). Claimant stated he worked regularly and seldom missed work other than for flu symptoms. (*Id.*). He was assessed with "seizures, currently under control," with instruction to follow up in 12 months. (*Id.*).

On April 10, 2006, Claimant attended an annual check-up with Dr. Dewey. (Tr. at 242). He reported having a seizure in December 2005, but attributed it "to missing his medication and having the flu." (*Id.*). He reported no other symptoms, and his physical examination was essentially normal. (*Id.*). Claimant was assessed with seizure disorder and instructed to follow-up in one year.

On January 10, 2007, Claimant attended a follow-up appointment with Dr. Dewey, in which he reported having "some trouble getting his Dilantin medication," but had "no specific neurologic complaints." (Tr. at 237). Claimant's physical examination was entirely normal, and he was assessed with "seizure disorder, currently under

control." (*Id.*). Dr. Dewey prescribed Phenytek in place of Dilantin, out of convenience and at Claimant's request. (*Id.*). On April 13, 2007, Claimant attended a follow-up appointment, in which he reported experiencing no seizures. (Tr. at 236). However, Claimant reported that "he wasn't able to keep his job in the warehouse because of his epileptic condition." (*Id.*). Claimant's physical examination was normal and Dr. Dewey observed in his assessment that Claimant's "seizures are currently controlled." (*Id.*). On July 12, 2007, Claimant reported having a recent seizure, which "occurred after he went on a cruise." (Tr. at 232). Claimant reported that he "at[e] a lot and got sick to his stomach and he figures he probably threw up his medication." (*Id.*). Claimant's Valproate and Phenytoin levels were observed as "a little subtherapeutic" and he was instructed to increase his Trileptil to 300 mg TID. (*Id.*). Claimant was assessed with "recent seizure, possibly due to GI upset" and instructed to follow-up in six months. (*Id.*).

On January 17, 2008, Claimant attended a follow-up appointment with Dr. Dewey, in which he reported "no seizures since September 2007," but that he had an "angry temper 12/31/2007." (Tr. at 230). Claimant reported that he had ceased driving in September 2007, and was not working. (*Id.*). Claimant's physical examination was again normal, and he was assessed with "seizures, controlled," with instructions to follow up in one year. (*Id.*). On June 11, 2008, Claimant attended a follow-up appointment with Dr. Dewey in which he "denie[d] any seizures since September 2007" and reported that his "girlfriend ha[d]n't told him of any nocturnal events." (Tr. at 226). Claimant's physical exam was essentially normal and he was assessed with "seizures, controlled" with instructions to follow up in January 2009. (*Id.*).

On January 15, 2009, Claimant reported having "had three small seizures since

returning from West Virginia" and noted that he "was reading a lot" and felt his eyes were blurring. (Tr. at 251). Claimant's physical examination was unremarkable, and he was assessed with seizure disorder. (*Id.*). Claimant was advised to schedule an eye examination or get reading glasses, and to continue his current medication. (*Id.*).

On June 17, 2010, Claimant underwent an EEG at Cabell Huntington Hospital, which Mark M. Stecker, M.D. interpreted as "a normal EEG in the Awake, Stage I states." (Tr. at 324). Dr. Stecker did note that a "normal EEG does not rule out epilepsy," and that "[i]f epilepsy is clinically suspected, a repeat tracing achieving a deeper level of sleep may be of further value in assessing this patient." (*Id.*). On June 24, 2010, Claimant's brain MRI was normal "with no acute signal abnormality identified" and "no evidence of mass lesion or infarct" and also "no abnormal areas of enhancement." (Tr. at 322).

On September 9, 2010, Claimant was treated by nurse practitioner Mona Baran, FNP-BC, who noted active problems including convulsions, headache, and seizure disorder. (Tr. at 269). Ms. Baran renewed Claimant's prescriptions for Phenytoin Sodium Extended and Divalproex Sodium. (*Id.*).

 On November 17, 2010, Claimant was admitted to the emergency room "with a one-week history of increasing tremor of his upper and lower limbs, more in the upper limbs, and unsteadiness of his gait." (Tr. at 287). Claimant also reported associated symptoms of nausea and a headache. (*Id.*). Claimant's physical examination revealed that he had "an ataxic gait with wide base" and that his "deep tendon reflexes [were] decreased in the lower limbs and plantar [was] down in both lower limbs." (Tr. at 288). Claimant was assessed with Phenytoin toxicity, and admitted in case of "possible cardiac effect of the Dilantin." (Tr. at 289). Claimant underwent a stationary ECG study, which

revealed "sinus rhythm" and "Normal ECG." (Tr. at 294). On November 18, 2010, Mark M. Stecker, M.D. provided a consultation, in which he indicated that following Claimant's recent move to West Virginia, "some manipulations were made to his medicine, but no improvement in seizures was noted with more Depakote and last Dilantin, so he was restarted on his previous dose of Dilantin ... When he came to the clinic yesterday, he was noted to be extremely ataxic and falling." (Tr. at 291). Claimant's physical examination revealed that he was "lethargic but oriented" and his "eye movements [were] slow but without nystagmus." (Tr. at 292). Likewise, although his movements were slow, they were grossly intact. (*Id.*). Claimant was assessed with Dilantin toxicity and the treating physician instructed that "he needs to be in the hospital until he can walk safely." (*Id.*). Claimant was discharged on November 19, 2010, after his Dilantin level dropped from 35 to 25. (Tr. at 284). Claimant was instructed to have his Dilantin level checked, and to "[f]ollow up with Dr. Stecker as scheduled." (Tr. at 285).

### B. Physical Evaluations and Opinions

On September 16, 2008, consultative evaluator Sondra Waugaman provided a physical RFC opinion of Claimant. (Tr. at 34-40). Ms. Waugaman opined that Claimant was subject to no exertional, manipulative, visual, or communicative limitations. (Tr. at 34-37). Regarding postural limtitations, Ms. Waugaman opined that Claimant could frequently climb ramps/stairs, balance, stoop, kneel, crouch, or crawl, and could occasionally climb ladder/rope/scaffolds, although she noted that this limitation was "only as a precaution secondary to what 'could happen' if a seizure were to occur." (Tr. at 35). Likewise, Ms. Waugaman recommended that Claimant avoid concentrated exposure to hazards such as machinery and heights "only as a precaution secondary to

what 'could happen' if a seizure were to occur," but otherwise opined that Claimant could withstand unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 37). Ms. Waugaman observed that as of the date of her evaluation, Claimant's seizure disorder was under good control without any restrictions, and that even with the assigned limitations, Claimant should be able "to return to many unskilled medium RFC jobs, most unskilled light jobs and all sedentary unskilled jobs." (Tr. at 38).

On September 29, 2008, Dr. Dewey provided a medical information sheet pursuant to a request from the Florida Department of Health, in which he described the nature of Claimant's seizures, frequency and treatment of his seizures, recent blood work, and overall compliance. (Tr. at 247). Dr. Dewey described Claimant's seizure activity as consisting of "generalized seizures" and "complex partial seizures – limb jerking, visual aura." (*Id.*). He noted that Claimant had expereinced "no major seizures" but had had three "mild" seizures "in which he has grunted and had shaking of abdomen." (*Id.*). Claimant's prescribed medication included "Dilantin 100 mg (2 in a.m., 3 in p.m.), Depakote 500 mg – 3 times a day, [and] Trileptal 300 mg (1 in a.m., 2 in p.m.)." As of June 28, 2008, Claimant had "normal CBC liver function tests, normal valproate level (65.2), phenytoin level (18.4)." (*Id.*). Dr. Dewey stated that Claimant was compliant with prescribed treatment and that his significant other monitored his dosing, although he occasionally missed his mid-day dose of Depakote when his significant other was at work. (*Id.*).

On February 17, 2009, consultative physician Terry Rees, M.D. provided a physical RFC opinion of Claimant based upon the most recent treatment records. (Tr. at 252-59). Dr. Rees opined that Claimant was subject to no exertional, manipulative,

10

visual, or communicative limitations. (Tr. at 253, 255-56). Regarding postural limitations, Dr. Reese opined that Claimant could never climb ladders/ropes/scaffolds; could occasionally climb ramps/stairs; and could frequently balance, stoop, kneel, crouch, and crawl. (Tr. at 254). Regarding environmental limitations, Dr. Rees opined that Claimant should avoid concentrated exposure to hazards such as machinery and heights, but could withstand unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and irritants such as fumes, odors, dusts, gases, and poor ventilation. (Tr. at 256). Dr. Rees noted that Claimant's symptoms were "credible and consistent with MER," but that he "does not meet listing level for seizure disorder." (Tr. at 257).

On March 18, 2010, nurse practitioner Mona Baran, NP-BC, CNRN provided a letter addressed to whom it may concern stating that Claimant was a patient in the epilepsy center at Cabell Huntington Hospital, and was currently being treated for seizure disorder. (Tr. at 261). Ms. Baran opined that Claimant "would benefit from low-income housing as he is unable to obtain employment as a result of his seizure disorder." (*Id.*). Ms. Baran also noted that Claimant had been advised "that he should not be operating dangerous equipment or working from ladders or other heights," and that "[t]hese restrictions ha[d] made it difficult, if not impossible, for Mr. Adams to find a job to support himself." (*Id.*).

On October 14, 2010, nurse practitioner Mona Stecker, NP-BC, CNRN provided a letter addressed to whom it may concern, in which she noted that Claimant's last seizure occurred on October 11, 2010. (Tr. at 282). Ms. Stecker also stated that Claimant was "capable of working only limited hours and should refrain from operating dangerous equipment, excessive stress and heights" and that Claimant was "restricted from

operating a motor vehicle until he is six months seizure free." (*Id.*).

On January 19, 2011, Ms. Stecker provided a letter addressed to whom it may concern, in which she noted Claimant's November 2010 hospitalization. (Tr. at 277). Ms. Stecker opined that Claimant, "due to his recent seizure activity, is restricted from driving." (*Id.*). Ms. Stecker further instructed that Claimant "also cannot work extended hours as his condition is sensitive to fatigue and sleep deprivation," that he "cannot operate dangerous equipment or climb ladders" and that he "should not work in a solitary environment." (*Id.*).

On July 6, 2011, Ms. Stecker provided a letter addressed to Claimant's benefits attorney, in which she opined that Claimant "is capable of performing his current job at Kroger supermarket" but that "he is not capable of working full time." (Tr. at 320). Ms. Stecker recommended that Claimant "maintain a limited number of working hours as stress and fatigue can exacerbate his seizure disorder," noted that "[l]imited working hours (<40 hours per week) would be a permanent restriction for Mr. Adams." (*Id.*). Further, Ms. Stecker reiterated that Claimant "cannot operate dangerous equipment or climb ladders" and that he "should not work in a solitary environment." (*Id.*).

## VI.  **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a de novo review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

Claimant argues that the ALJ's RFC assessment is unsupported by substantial evidence for failure to address nonexertional limitations, which were stated by both of the nonexamining state agency experts, as well as Claimant's treating health care providers. (ECF No. 11 at 5). Specifically, Claimant argues that the ALJ should have limited Claimant's ability to climb, as well as his exposure to hazards such as machinery or heights. (*Id.* at 6-7). After reviewing the relevant medical and evaluative evidence, the undersigned agrees that the ALJ's RFC assessment is not supported by substantial evidence, as the ALJ failed to adequately explain his exclusion of all postural and environmental limitations. Indeed, the ALJ provided no focused discussion of the opinions of treating nurse practitioners, Mona Baran and Mona Stecker,[1] or the agency evaluators, all of whom opined that Claimant was limited in his ability to climb, and that

---

[1] Mona Baran and Mona Stecker may be the same individual who simply underwent a name change due to an event, such as an alteration in marital status; however, the record does not clarify this issue.

he should avoid exposure to hazards such as dangerous machinery and heights. Consequently, some discussion and reconciliation of this evidence was necessary.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receive[s]." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Medical sources which are not considered "acceptable medical sources," including nurse practitioners, cannot establish the existence of a medically determinable impairment, but their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-03p, 2006 WL 2329939, at *3 (S.S.A. 2006).

Ultimately however, the determination of an individual's RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Thus, medical source opinions regarding a Claimant's RFC are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."[2]

---

[2] Examples of issues reserved to the Commissioner include "(1) whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings; (2) what an individual's RFC is; (3) whether an individual's RFC prevents him or her from doing past relevant work; (4) how the vocational factors of age, education, and work experience apply; and (5) whether an individual [is unable to work or] is 'disabled' under the Social Security Act." SSR 96-5p, 1996 WL 374183, at *2.

SSR 96-5p, 1996 WL 374183, at *2 (S.S.A. 1996). However, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.*

> If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR 404.1527(d) and 416.927(d).[3]

*Id.* at *3.

That is, the ALJ will generally give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). However, the ALJ must analyze and weigh all medical source opinions in the record, including those of non-examining sources. *Id.* §§ 404.1527(e), 416.927(e). Relevant factors include: (1) length of the treatment relationship and frequency of evaluation; (2) nature and extent of the treatment relationship, (3) degree to which an opinion is supported by relevant evidence and explanations; (4) consistency of an opinion with the record as a whole, (5) whether the source is a specialist in the area relating to the rendered opinion; and (6) any other factors which tend to support or contradict the opinion, including "the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record. *Id.* §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

---

[3] The applicable factors are now found in 20 C.F.R. §§ 404.1527(c), 419.927(c).

If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981)). In the context of determining an individual's RFC, the ALJ must always consider and address medical source opinions, and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. 1996). Ultimately, it is the responsibility of the ALJ, rather than the court, to evaluate the case, make findings of fact, resolve conflicts of evidence, *Hays*, 907 F.2d at 1456, and provide good reasons in the written decision for the weight given to the opinions. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

In this case, the ALJ determined that Claimant was capable of performing the full range of medium work under 20 C.F.R. §§ 404.1565(c), 416.967(c), considering only Claimant's exertional limitations and using the Medical-Vocational Guidelines. (Tr. at 12). The ALJ failed entirely to evaluate any potential postural or environmental limitations resulting from Claimant's impairment, despite the fact that all of the RFC opinions on record included such limitations. Treating nurse practitioners, Mona Baran and Mona Stecker of University Physicians and Surgeons, Inc., consistently and repeatedly opined that Claimant was unable to operate dangerous equipment or climb

16

ladders. (Tr. at 261, 277, 282, 320). State agency evaluator Sondra Waugaman opined that Claimant could only occasionally climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to hazards such as machinery and heights. (Tr. at 35, 37). Similarly, state agency evaluator Dr. Rees opined that Claimant could never climb ladders, ropes, or scaffolds; could only occasionally climb ramps and stairs; and should avoid concentrated exposure to hazards such as machinery and heights. (Tr. at 254, 256). These opinions comport with the findings and opinions of Claimant's treating provider, Dr. Dewey, (Tr. at 226-51), to which the ALJ granted "significant" and "considerable" weight. (Tr. at 14). Thus, even assuming the ALJ discounted the treating nurse practitioners' opinions[4] regarding Claimant's limitations, the ALJ should have more fully addressed the opinions of the consultative evaluators. *See* SSR 96-5p, 1996 WL 374183, at *5 ("Adjudicators must weigh medical source statements. . . providing appropriate explanations for accepting or rejecting such opinions."); SSR 96-8p, 1996 WL 374184, at *7 (describing narrative discussion requirements). Unfortunately, the written decision never clarifies why the ALJ chose to disregard *all* of the medical source opinions regarding Claimant's postural and environmental limitations.

Although the ALJ granted varying weight to the opinions of Ms. Baran and Ms. Stecker, this appears to have been based upon their more general opinions regarding Claimant's overall ability to work. (Tr. at 14-15). The ALJ did observe that Ms. Stecker had restricted Claimant "from working extended hours, could not operate dangerous equipment, climb ladders, or working in a solitary environment." (Tr. at 15). However, in "grant[ing] some weight to this opinion as it substantiates an ability to work," the ALJ

---

[4] It should be noted that Nurse Stecker explicitly writes the opinion on behalf of the epilepsy center at Cabell Huntington Hospital, which includes treating physicians, as well as nurse practitioners. (Tr. at 280).

failed to address whether the assigned limitations were supported by evidence or otherwise creditable. (*Id.*). Regarding the state agency opinions, the ALJ "concluded that the claimant's impairments have become more severe than initially assessed by the state agency medical consultants." (*Id.*). Despite this conclusion, the ALJ declined to include any of the postural and environmental limitations opined by the state agency consultants, and further failed to discuss his rationale for doing so. *See DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983) ("Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator."). The ALJ simply failed to explain how he reconciled the considerable evidentiary weight of the medical source opinions corroborating postural and environmental limitations with his RFC rejecting all such limitations. Having failed to sufficiently articulate the reasons for not including any nonexertional limitations, the ALJ's RFC assessment is not supported by substantial evidence. Therefore, the decision of the Commissioner is not supported by substantial evidence and should be remanded for further proceedings.

There are other inconsistencies in the ALJ's decision that would not on their own merit remand, but should be examined when the Claimant's RFC assessment is reviewed. For example, the ALJ found Claimant capable of performing the full range of medium exertional work, yet inexplicably found him unable to perform his past relevant occupations, all of which were classified as medium exertional work. (Tr. at 15-16). Furthermore, the ALJ seemed to rely heavily on Claimant's testimony that he worked part-time as a bagger at a local Kroger grocery store to support the ALJ's finding that Claimant was capable of performing medium exertional work on a regular and sustained basis. (Tr. at 13). Certainly, Claimant's testimony was highly relevant to the disability

determination. Nevertheless, the ALJ's view of Claimant's testimony overlooked a few significant points. First, the ALJ emphasized that Claimant had worked as many as thirty hours per week at Kroger and even worked until the store closed at night. (Tr. 13). While it is true that Claimant provided such testimony, he also clarified that he had worked thirty hours per week only twice and had to stop because his seizure activity increased with the extended hours, as did his side effects from the seizures. (Tr. at 25). He also testified that working at night was a problem because his parents lived about a half an hour into the mountains making it difficult to drive. (Tr. at 26). In fact, at the time of the hearing, Claimant was restricted from driving due to his recent seizure activity. (Tr. at 280). Claimant went on to testify that his regular schedule at Kroger was a shift of two, three, four, or five hours per day, four or five days per week. (Tr. at 28). Sometimes, he worked only one hour in a day, and sometimes he worked eight hours. (Tr. at 28-29).

Claimant additionally testified—and the ALJ again emphasized—that the Kroger store made no "accommodations" for Claimant's impairment. However, other testimony belied this point. Claimant indicated that he had frequent side effects from nocturnal seizures, including headaches and stomach aches, which often required him to take naps. He also experienced daily tremors, shaking, and twitches from his anti-seizure medication. (Tr. at 22-24). Undoubtedly, these side effects, and the time needed to recover from them, affected the shifts that Claimant was capable of working. Therefore, allowing Claimant to work flexible schedules that ranged from one hour to eight hours per day, while not an on-the-job accommodation, was an accommodation by Kroger nonetheless. Consequently, the slant given to the testimony by the ALJ does not appear accurate and begs the question of whether Claimant's work at Kroger deserves the

evidentiary weight given to it by the ALJ.

Accordingly, the undersigned respectfully **RECOMMENDS** that the District Court **FIND** that the ALJ's RFC assessment is not supported by substantial evidence given that the ALJ did not sufficiently address and resolve the evidence regarding Claimant's nonexertional limitations. The undersigned further **RECOMMENDS** that the decision of the Commissioner be **REVERSED** and **REMANDED** to determine (1) the nature and extent of Claimant's postural and environmental limitations, if any, and (2) whether Claimant is capable of performing a full range of medium level exertional work in light of his nonexertional limitations.

**VIII. <u>Recommendations for Disposition</u>**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Plaintiff's motion for judgment on the pleadings, (ECF No. 11); **DENY** Defendant's motion for judgment on the pleadings (ECF No. 14), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings in accordance with the findings and recommendations herein; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with

the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 6, 2014.

Cheryl A. Eifert
United States Magistrate Judge